IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiffs,

vs.

ELMER ALEXANDER ANDRADE,

Defendant.

8:18CR28

**FINDINGS AND RECOMMENDATION**

This matter is before the Court on Defendant Elmer Alexander Andrade's Motion to Suppress Evidence (Filing No. 47). An evidentiary hearing was held on Defendant's motion on August 1, 2018 and August 9, 2018. Having heard the testimony and considered the evidence, the undersigned will recommend that the motion be denied.

**FACTUAL BACKGROUND**

On January 18, 2018, Nebraska State Patrol ("NSP") Investigator Dan Fiala ("Fiala") contacted NSP Trooper Greg Goltz ("Trooper Goltz")[1] and advised that a confidential source[2] ("CS") had reported that a vehicle would soon be coming into Hall County transporting methamphetamine. (TR. 12; Ex. 3.) Fiala relayed to Trooper Goltz that the vehicle was on its way to a specific residence. (TR. 12.) Fiala then provided Trooper Goltz the address of the residence. (TR. 12.) Fiala informed Trooper Goltz that the CS had reported that the vehicle was going to the residence to unload methamphetamine, and that the methamphetamine would pretty much be out in the open as it traveled. (TR. 12; Ex. 3.) From the residence, the vehicle would travel to either Grand Island or Hastings, Nebraska. (TR. 12.) Fiala asked Trooper Goltz to be near the area of the residence to either intercept the vehicle or try to conduct a traffic stop. (TR. 13.)

---

[1] Trooper Goltz has been a trooper for thirty years. (TR. 8.) Trooper Goltz has 400 hours of training regarding interdiction and drug investigations. (TR. 8-9.) Trooper Goltz teaches drug and criminal interdiction. He has been training NSP troopers since 1996. (TR. 9.)

[2] The Court notes that the confidential source was referred to as a "confidential informant" in the evidentiary hearing.

Fiala described the subject vehicle to Trooper Goltz as a black Ford Expedition with a California license plate. (TR. 13.) Fiala also provided Trooper Fiala with the vehicle's license plate number. (TR. 13.) When officers ran the license plate number, they learned the vehicle was a rental. (TR. 13.)

Trooper Goltz then met with Fiala and Adams County Deputy Sheriff Glenn Kemp ("Sheriff Kemp") at the Wood River exit truck stop. (TR. 14.) There, Fiala told Trooper Goltz that the subject vehicle was at the residence and that there were two Hispanic males behind the garage of the residence unloading methamphetamine. (TR. 14.) Trooper Goltz believed the vehicle would be coming towards the highway at the Wood River exit, so he parked his cruiser facing eastbound in a driveway located north of the stop sign of a county road. (TR. 15, 47-48.) As he sat there, Trooper Goltz saw an approaching vehicle that matched the description provided by investigators. (TR. 15.) The vehicle was a quarter of a mile away when Trooper Goltz first spotted it. (TR. 47.) Trooper Goltz testified that he witnessed the vehicle stop at the stop sign on the county road, and then turn south without activating a turn-signal. (TR. 15.) Trooper Goltz testified that as the vehicle stopped, he could see its left side, but as it turned, he could see the rear of the vehicle and that the turn signal was not on.[3] (TR. 50.)

Trooper Goltz pulled out of the driveway to conduct a traffic stop. The cruiser was equipped with a video and audio recording system, which activated when Trooper Goltz turned on his emergency lights. (TR. 15, 17.) Trooper Goltz testified that as he followed the vehicle, he observed another traffic violation. (TR. 19.) He saw the vehicle cross the center line while navigating a curve in the roadway. (TR. 19.) This violation is visible in the video of the traffic stop. (TR. 19, Ex. 1.)

Once the vehicle stopped, Trooper Goltz approached the driver's window. (TR. 20.) The driver of the vehicle was identified as Defendant from his California driver's license. (TR. 20.) The passenger of the vehicle was identified as Juan Carlos Camacho-Jimenez, Jr. ("Camacho").

---

[3] The driveway that Trooper Goltz was parked in is located on the highway that Defendant eventually turned on. (TR. 47-48.)

2

(TR. 23; Ex. 3.) Defendant told Trooper Goltz that the vehicle was a rental. (TR. 22.) While conducting a criminal history check, Trooper Goltz engaged Defendant in conversation. (TR. 22-23.) Trooper Goltz asked Defendant for consent to search the vehicle. (Ex. 1.) Trooper Goltz testified that part of the reason he sought consent to search the vehicle was based on the information he received from investigators. (TR. 26.) Defendant initially gave consent, but subsequently withdrew consent. (TR. 26; Ex. 1.) Trooper Goltz then advised Defendant that he was going to call for a K-9 to sniff the vehicle. (TR. 27.) Defendant was placed in the rear of the cruiser, and Camacho was placed in the front passenger seat. (TR. 26.)

Trooper Goltz called Fiala and Sheriff Kemp and told them that Defendant had provided consent, but that consent was revoked and a K-9 was called. (TR. 26.) When Fiala and Sheriff Kemp arrived on the scene of the traffic stop, Trooper Goltz learned that Defendant was someone investigators were well-aware of and that Defendant had been involved in drug activity for years in the Hastings area. (TR. 27-28.)

NSP Trooper Matt Workman ("Trooper Workman") arrived at the scene with his K-9 approximately thirty-eight minutes after Defendant was detained.[4] Trooper Workman testified that during the first pass around the vehicle, his K-9 alerted in between the driver's door and the left rear passenger door.[5] (TR. 116.) Trooper Workman stated that once his K-9 alerts, but does not indicate, he typically goes back to the area to recheck it, which he did in this case. (TR. 117.) As he went to re-check the area, Trooper Workman directed his K-9 to sniff higher on the vehicle. (TR. 117.) Trooper Workman testified that this is called a "direct search" and is common practice in the K-9 industry. (TR. 139-40.) Trooper Workman testified that the purpose of a direct search

---

[4] There was some dispute as to the length of time it took for the canine to arrive on the scene. The parties ultimately stipulated that it took thirty-eight minutes for the K-9 to arrive. (TR. 92.)

[5] An alert by a drug detection K-9 is a spontaneous change in the dog's behavior. An indication is the action that the dog does once it has pinpointed the strongest source of the drug odor. (TR. 111.) Trooper Workman testified that his K-9 is a passive indicator, which means the dog is trained to either sit, lay down, stand, or freeze to indicate the odor of narcotics. (TR. 112.) Trooper Workman testified that his K-9's alert consists of a heard snap or head move to a particular place, as well as a refusal to leave the area. (TR. 125.) Trooper Workman stated that you can see his K-9's second alert on the video of the stop just before the K-9 indicated. (TR. 126.)

is to assist the K-9 in finding the strongest source of the odor. (TR. 117.) Trooper Workman stated that a direct search is part of each of his K-9 deployments and is the only way to communicate with the K-9. (TR. 151-52.) As Trooper Workman and the K-9 were coming around the back of the vehicle, the K-9 alerted on the left rear seam of the rear hatch of the vehicle and indicated by sitting down. (TR. 117.) Trooper Workman testified that he did not direct his K-9 to indicate. (TR. 117.) Following the indication by the K-9, the vehicle was searched, and methamphetamine was located. (TR. 33-34.) Defendant and Camacho were placed under arrest and the vehicle was taken back to the NSP office in Grand Island, Nebraska for further search. (TR. 34-35.)

Following the arrest and search of the vehicle, Sheriff Kemp applied for and obtained a warrant to search Defendant's residence. (TR. 158.)

## DISCUSSION

Defendant requests that the Court suppress all evidence and statements obtained from the traffic stop on January 18, 2018 and the subsequent search of his residence. Defendant argues that law enforcement did not have probable cause to stop his vehicle and impermissibly extended the duration of the traffic stop to obtain a K-9 sniff. Defendant also argues that the subsequent search of his home was improper because the search warrant was obtained based on the unlawful traffic stop.[6] The undersigned finds each of Defendant's arguments unpersuasive.

---

[6] Defendant's brief contains an argument that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) were violated. (Filing No. 48.) However, Defendant did not actually assert a *Miranda* violation in his motion. In any event, Trooper Goltz testified that he did not read Defendant his *Miranda* rights when he first approached Defendant because Defendant was not under arrest at that point. Trooper Goltz stated that he did not plan to ask Defendant any questions related to the reasons for Defendant's ultimate arrest. (TR. 44.) The video of the encounter shows that Trooper Goltz made small talk with Defendant and asked him routine questions related to his travel while the criminal history check was being completed. (Ex. 1.) *Miranda* warnings were not required at that point. *See United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (stating that during a traffic stop, an officer may inquire about "the occupants' destination, route, and purpose"). No evidence was presented during the evidentiary hearing that Defendant made any statements following his detention or arrest. Therefore, Defendant's assertion that his *Miranda* rights were violated lacks merit.

### 1. Stop of the Vehicle

"A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." United States v Andrews 454 F.3d 919, 921 (8th Cir. 2006). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." Id. "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).

Trooper Goltz testified that he observed Defendant commit two traffic violations just prior to the traffic stop. Trooper Goltz testified that he first witnessed Defendant fail to signal a turn at the intersection. Moments thereafter, Trooper observed Defendant's vehicle travel over the center line while navigating a curve in the roadway. This violation is visible in the video of the traffic stop. Trooper Goltz's testimony is credible and supported by the evidence. Thus, the undersigned concludes that Trooper Goltz had probable cause to conduct a traffic stop.

### 2. Duration of the Stop

Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. See United States v. Beck, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." Rodriguez v. United States, 135 S.Ct. 1609, 1615 (2015) (quotation omitted). Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." Beck, 140 F.3d at 1136 (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." United States v. Garcia, 23 F.3d 1331, 1334 (8th Cir. 1994).

Defendant argues that law enforcement unlawfully prolonged the traffic stop beyond what was necessary to complete the stop in contravention of *Rodriguez*, in which the Supreme Court held that absent reasonable suspicion, a seven or eight-minute extension of traffic stop to conduct a drug sniff violated the Fourth Amendment. *Rodriguez*, 135 S.Ct. at 1616. Here, however, unlike in *Rodriguez*, the officers had reasonable suspicion of criminal activity.

Investigators had been informed by a CS that a vehicle matching the exact description of that driven by Defendant would be traveling to a specific residence to unload methamphetamine.[7] Shortly before the stop, Trooper Goltz was informed that the vehicle had been observed at the residence unloading methamphetamine. The series of events expected by investigators based on the information received from the CS is precisely what happened. The undersigned finds, based on the totality of the circumstances, that law enforcement had reasonable suspicion that justified extending the traffic stop. The approximate thirty-eight-minute wait for the K-9 did not convert the otherwise lawful stop into an unreasonable detention. *See United States v. Bloomfield*, 40 F.3d 910, 917-19 (8th Cir. 1994) (finding that one-hour detention waiting for K-9 was lawful when officer had reasonable suspicion of drug activity).

---

[7] There was no evidence presented regarding how the CS received this information, nor was there any testimony regarding the reliability of the CS. Defendant has not specifically argued that the CS was an unreliable source. The Court notes, however, that the "reliability of an [unknown] informant's information is bolstered if the tip is corroborated not only by matching an identity or description, but also by accurately describing a suspect's future behavior." *United States v. Cardenas*, Crim. No. 15-198(1), 2016 WL 184390, *3 (D. Minn. Jan. 15, 2016) (quotation omitted). *See also United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) ("An informant may . . . prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place"). The fact that Trooper Goltz did not receive this information first-hand is also of no consequence. *See United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993) ("[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication"). In this case, the CS gave particularized descriptions and information regarding future behavior, which investigators substantially corroborated.

### 3. Search of the Residence

Defendant argues that the search warrant for the residence was defective because the traffic stop was unlawfully extended to obtain a canine sniff. According to Defendant, any evidence gained from the stop is fruit of the poisonous tree and cannot serve as a basis for a search warrant. However, as explained above, there was probable cause for the traffic stop and reasonable suspicion to prolong the stop. Therefore, the evidence gained from the stop could be used to support issuance of the warrant.

Defendant also argues that the issuing judge was misled into believing that the K-9 had alerted to the odor of narcotics coming from the vehicle.[8] Defendant contends that the K-9 was coaxed into alerting when Trooper Workman directed the K-9 to the passenger rear door. Trooper Workman explained, however, that during the first pass around the vehicle, his K-9 alerted in between the driver's door and the left rear passenger door. After the initial alert, Trooper Workman, per his usual practice, went back to recheck the area. Trooper Workman directed his K-9 to perform a direct search to assist the K-9 in finding the strongest source of the odor. A direct search is common practice in the K-9 industry and Trooper Workman testified that he performs a direct search in each of his K-9 deployments. As Trooper Workman and the K-9 were coming around the back of the vehicle, the K-9 alerted on the left rear seam of the rear hatch of the vehicle and indicated by sitting down. Trooper Workman testified that he did not direct his K-9 to indicate at any point. The undersigned finds Trooper Workman's testimony credible and supported by the evidence. There is no indication that the K-9 was coaxed into alerting or indicating on the vehicle. Based on the evidence presented, the undersigned concludes that the search warrant was not defective or otherwise obtained unlawfully.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress Evidence (Filing No. 47) be denied.

---

[8] The Court notes that the K-9 was properly certified at the time of the search. (Ex. 4.)

7

Dated this 28th day of September, 2018.

                                            BY THE COURT:

                                            s/ Susan M. Bazis
                                            United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.